# Exhibit A

Page 1

Volume: I
Pages: 1-54

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss. BOSTON MUNICIPAL COURT
Docket No. 2010-01-AC-0207

AUDREY BELL,
Plaintiff

vs.

GLENN KRUGER,
Defendant

DATE: December 3, 2010

LOCATION: Boston Municipal Court
90 Devonshire Street
Boston, MA 02109

Page 2

A P P E A R A N C E S

CRAIG & MACAULEY
(By Allison M. O'Neil, Esq.)
600 Atlantic Avenue
Boston, Massachusetts 02210
On behalf of the Plaintiff, Audrey Bell

EDMUND MATHERS, ESQ.
130 Liberty Street
Brockton, Massachusetts 02401
On behalf of the Defendant, Glenn Kruger

Page 3

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| AUDREY BELL | | | | |
| (By Ms. O'Neil) | 8 | | 28 | |
| (By Mr. Mathers) | | 18 | | |
| GLENN KRUGER | | | | |
| (By Mr. Mathers) | 29 | | | |
| (By Ms. O'Neill) | 38 | | | |

Page 4

P R O C E E D I N G S

THE COURT: Calling Civil Case 2010-01-AC Number 207, the matter of Audrey Bell vs. Glenn Kruger.

MR. MATHERS: Good morning, Your Honor. Chuck Mathers for Mr. Kruger.

THE COURT: Good morning.

MS. O'NEIL: And Allison O'Neil on behalf of Audrey Bell.

THE COURT: Have you filed appearances?

MR. MATHERS: Yes.

THE COURT: Let's see. Okay. I have one from Attorney Mathers, Attorney O'Neil. Is this the first hearing? There hasn't been -- is there an order in effect or not?

MS. O'NEIL: There is not --

MR. MATHERS: Temporary.

MS. O'NEIL: Ms. Bell was here previously, and this is the first hearing, Your Honor.

THE COURT: All right. Have you conferenced with each other at all to see if you can work something out here? I don't know any of

the facts yet, but I always put that question out there in the event you might come to some agreeable resolution if the parties are agreeable.

MS. O'NEIL: I don't -- we did conference, Your Honor. We did speak outside about a couple of open logistical issues. I did ask counsel if he was agreeable to having the order extended, and he indicated not. So I do think we require a hearing.

THE COURT: Is there an order -- I asked whether -- what do you mean, extended? Is there an order in effect?

MS. O'NEIL: I don't believe there's an order in effect, --

THE COURT: I don't see an order in effect.

MS. O'NEIL: -- but there was a prior hearing and the matter was set for a full hearing today. But I misspoke; I asked if counsel would consent to an order being issued, and he indicated -- I don't want to speak for you, counsel --

THE COURT: All right. So it was set

down for a two-party hearing today.

MR. MATHERS: I agree, Your Honor; I think we need a hearing.

THE COURT: You think we need a hearing.

MR. MATHERS: Yeah.

THE COURT: Okay. All right. All right, then everybody have a seat. Let me look at the complaint here.

(The Court reviews documents.)

THE COURT: Okay. Before I begin your hearing, so in order to give it my full attention, what I'd like to do is take a short recess, and I want to finish the other case and move it along. And then we will be able to go without interruption on your case. I know you've been here since 9:00.

MS. O'NEIL: That's okay. That's fine, Your Honor.

THE COURT: And I apologize for the delay. But I will reach you shortly, and it's the only matter I have left in this session right now, so I will be able to address it.

MS. O'NEIL: Thank you.

THE COURT: All right. In the meantime,

if there are any grounds whatsoever for -- before The Court makes a determination on the evidence, any grounds for you to work something out amicably, I'll give you that brief opportunity. All right?

MS. O'NEIL: Thank you.

THE COURT: I'm going to take a brief recess to look over the prior matter. I'll be back.

(Off the record.)

THE CLERK: Calling the matter of Audrey Bell vs. Glenn Kruger. Would both of the parties please raise their right hands, please?

(Parties sworn.)

THE COURT: Counsel, once again identify yourselves.

MS. O'NEIL: Certainly. Allison O'Neil on behalf of Audrey Bell.

MR. MATHERS: For Glenn Kruger, Chuck Mathers, Your Honor.

THE COURT: Are you ready to go forward?

MS. O'NEIL: We are, Your Honor.

THE COURT: All right. You may call your witness.

MS. O'NEIL: If Audrey Bell could approach. Your Honor, do you wish that I inquire, or --

THE COURT: Yes, that would be preferable.

MS. O'NEIL: Okay. Thank you.

DIRECT EXAMINATION

BY MS. O'NEIL:

Q Ms. Bell, could you please state your name, spelling your last for the record?
A Audrey Bell, B-E-L-L.
Q And do you know Glenn Kruger?
A Yes. Glenn Kruger and I were in a dating relationship for a year and a half.
Q And when did that relationship begin?
A Roughly June -- April, May, June time period --

THE COURT: What --

A -- of 2009.

THE COURT: 2009.

Q And when did that relationship end?
A About one month ago.

Q What brought you in and what caused you to seek a restraining order?
A During our relationship, he was very aggressive and physically abusive and pushing me on a number of occasions, so I'm kind of living currently in fear under the current circumstances.
I found out that he had installed tracking software on my work laptop, my personal laptops, on my Blackberry. I have also recently found --
THE COURT: How did you learn that?
MS. BELL: I found out that a lot of -- some e-mails were intercepted. I've also had a verbal confirmation from the company --
THE COURT: How did you know e-mails were intercepted?
MS. BELL: It was -- they were intercepted through a previous girlfriend of his who had said that she had sent me an e-mail, you know, and I had never received it.
Q So you spoke to the recipient of the e-mail and learned that they didn't receive the e-mail?
A Correct, yes.
Q And that's how you learned the e-mails were being

intercepted?
A Right.
Q What was the web-tracking software that you had learned had been installed?
A It basically tracks everything that I do on the computer, my e-mails, my instant messages, takes screen shots of websites that I go to, you know, has a key-logger aspect to it, and anything and everything that I do on my laptop. Also, on my Blackberry, it records all of the text messages.
Q And have you been in contact with an individual at the web-tracking software company?
A Yes.
Q What's the name of that company?
A Web Watcher Now.
Q Do you recall the name of the individual who you've been in contact with?
A Yup, Jen Lumanka (phonetic).
Q What have you been told about what they're doing about the software?
A They're currently investigating. I spoke directly on the phone with someone who had told me the account had been turned off, but they're still in the investigation process.

Q And you started to talk about or you mentioned an ex-girlfriend of Mr. Kruger's that you had spoken to as of late?
A Yes.
Q And what was the nature of some of those dialogues that you had?
A They were just kind of going over the history that Glenn had had with these other girlfriends who, you know, he had secret relationships with them while we were dating.
Q Did this all come to light in the past couple of days?
A Many facts have come to light in the past few days.
Q Has that caused your fear --
A Yes.
Q -- to increase as of late?
A Yes, absolutely.
Q As you sit here today, are you in fear of Mr. Kruger?
A Very much so.
THE COURT: What's the basis -- apart from what you've described, what's the basis of that fear?

MS. BELL: His previous behaviors and just being aggressive.
THE COURT: Pardon me?
MS. BELL: His previous behaviors and being aggressive.
THE COURT: When you say -- okay. The aggressive behavior?
MS. BELL: Yes.
THE COURT: Toward you?
MS. BELL: Yes.
THE COURT: We're not talking about any other prior girlfriends, but toward you specifically?
MS. BELL: Right.
THE COURT: And over how long a period of time was that behavior?
MS. BELL: We dated for a year and a half, and it was during arguments where he was, you know, very mad, he'd get very mad and aggressive and he would push me.
THE COURT: Were you ever injured physically?
MS. BELL: I was never injured.
THE COURT: Okay. Did the aggressive

physical behavior manifest itself in any other way besides pushing?

MS. BELL: I mean, definitely emotional and other physical ways. He may have grabbed my arm a few times, but there was never any, you know, punching or anything like that.

THE COURT: Any threats of harm besides the actual physical --

MS. BELL: I think the control he had over me. I just felt very controlled. I couldn't -- you know, I felt, like, bad about being with my friends without telling him where I was going. I just felt very -- he had to be in total control over me.

THE COURT: What kind of work do you do?

MS. BELL: Advertising sales for a fitness company.

THE COURT: What is his work?

MS. BELL: Investment banking.

THE COURT: Okay. At some point, did you terminate the relationship?

MS. BELL: Yes.

THE COURT: How did you do that?

MS. BELL: When I found out that he had

had these other relationships, I terminated it then.

THE COURT: At the same time -- what was it about those that affected you?

MS. BELL: Well, he had had a physical relationship with someone else while we were supposed to be in a monogamous relationship. So once I learned that, I ended it. You know, him and I had a dialogue coming out of that. Of course, I was in shock and denial.

And through all of that, I had learned about the Web Watcher, and just in talking to these girls, I've seen that -- I've come to know that e-mails have been intercepted and . . .

THE COURT: And that was because someone else had -- I guess I'm a little bit confused about how you discovered that.

MS. BELL: Okay.

THE COURT: Would you tell me that again?

MS. BELL: Yeah, so I had uncovered information that Glenn had had a relationship with an ex-girlfriend. That ex-girlfriend told me about another ex-girlfriend who I had e-mailed

over Facebook just to see if they had been in contact.

I didn't get a response from her. I e-mailed her again. She had mentioned that she did send me an e-mail and she'll send it again. So it was through Facebook, so that would have had to have gone through my -- to my G-Mail to my Facebook, and they were both deleted from there.

THE COURT: Okay. Anything else?

Q Ms. Bell, did Mr. Kruger have a key to your apartment at any point in time?

A I never gave him one. I don't doubt that he probably had made a copy. I've recently had my locks changed.

Q Now, did you go and speak to individuals at the Boston Police Department?

A Yes.

Q And when did you do that?

A About a couple of weeks ago.

Q Did you do that when the relationship terminated?

A A few weeks following.

Q And did you speak with individuals at the Boston Police Department about some of these facts that you've described here today?

A Yes.

MS. O'NEIL: Your Honor, Mr. Mathers has a copy, and I believe there's a copy in the -- as part of the restraining order application, a Boston Police report that is dated November 19th.

THE COURT: When you broke off the relationship, was there any continued contact?

MS. BELL: Yes.

THE COURT: What was the nature of that?

MS. BELL: Initially, it was dialogue between him and I, just -- I was in shock and just trying to find out information.

And then after that, I had asked him to please stop contacting me. And following that request, I had seen him at the Liberty Hotel, where he came up behind me, poked me, asked me to come downstairs, questioned who I was talking to, you know, sent me a text the next day, you know, saying that he's hearing these stories about me and he doesn't feel bad for everything that he's done.

And so kind of following that text, those text messages is when I came down to get the restraining order. And since he's received

that letter, I have not heard from him since.

THE COURT: And what was the content of the text messages?

MS. BELL: I have them in my phone, I can show you, but they were -- it was basically, you know, "Why are you talking to that guy?" You know, "Come downstairs." You know, "You're a beautiful girl, you could do better," things like that.

Q In addition to that interaction in a bar, have you seen him -- did he show up other places that you tended to frequent?

A I've seen him at the gym, you know, in the morning when he knows kind of what classes that I go to. I've seen him at the Liberty Hotel on, you know, several occasions.

Q And is that a place that you frequented while you were dating Mr. Kruger?

A Yes.

THE COURT: So it's a place you both frequent? You both go to the Liberty Hotel?

MS. BELL: Yes.

THE COURT: You both go to the same gym?

MS. BELL: Yes.

THE COURT: Anything else?

MS. O'NEIL: Nothing further, Your Honor.

THE COURT: Any questions --

MR. MATHERS: Couple of questions, Your Honor, if I may.

THE COURT: Yeah.

CROSS EXAMINATION

BY MR. MATHERS:

Q Ms. Bell, you had filled out an affidavit in your application for this order, did you not?

A Yes.

Q And at the top of the application, it requests that you, "Provide details of the history of abuse with as much of the above detail as possible." Isn't that what it says?

A Um-hum.

Q So when you wrote that affidavit, you tried to be as detailed as you could, right?

MS. O'NEIL: Objection, Your Honor.

THE COURT: Overruled. He may have it.

A Yeah, I was -- yeah, I mean --

Q Well, anywhere --

A I wrote down top line details, yes.

Q Anywhere in your affidavit, did you mention that my client pushed you?

A I think I may have just put "aggressive behavior." I didn't go into detail there.

Q So what you meant by aggressive and arguments is that he was pushing you on a regular basis?

A He pushed me during arguments, not daily.

Q Could you describe the push for us?

A Pretty forceful.

Q Did he slam you up against a wall so that your head banged against the wall, anything of that nature?

A No. It was just an aggressive push.

Q Were you turned facing away from him at the time and did he turn you around?

A No.

Q It was a flat-out face-to-face shove; is that what you're telling us?

A No, on one occasion, it was come up behind me and shove me. On one occasion, it was shoving me while I was laying down in bed to try to get

information out of me. You know, on another occasion, it was just at a wedding because, you know, I wasn't -- I didn't dance with him when he wanted me to dance with him.

Q And any witnesses at that wedding assault?

A Yes.

Q And who were the witnesses?

A Two of Glenn's friends.

Q Two of Glenn's friends. You mentioned a -- first of all, with respect to the web tracking software, eventually you talked to Mr. Kruger about that, and he admitted that he had done it; is that right?

A No. He admitted that he had put a key logger on my computer and he had said it's not the kind that you pay for, it's easily removed.

This is an in-depth technology that tracks everything that I do, everything on my computer, my work computer, my personal and my Blackberry.

THE COURT: How would he get access to your work computer?

MS. BELL: I work out of my apartment.

THE COURT: I see.

Page 21

Q And he never admitted to installing this software on your computer?
A He admitted to installing a key logger. And again, he said, you know, it's not the kind that you pay for, it's not --
THE COURT: What's a key logger?
MS. BELL: It just probably tracks -- I think it tracks your password. So that's kind of how he smoothed over him intercepting these e-mails and knowing -- and seeing some e-mails.
Q Eventually, you took your computer in to be serviced and remove whatever was on there, did you not?
A I did, but this technology is undetectable, and the account has to be turned off. It can't be removed.
Q And the account, to your knowledge, has been turned off; correct?
A Web Watcher has said that they have turned the account off.
Q And did Mr. Kruger reimburse you for the cost of whatever services were performed on the computer?
A I had Web Geeks come over. They uncovered nothing. As I had mentioned, it's undetectable.

Page 22

He had owed me money for the wedding that we had gone to. I had mentioned that I had these people come over, so he did reimburse me for the Web Geeks coming. And this was before I knew about the web tracker.
Q Now, you ended the relationship, and there was contact after that decision; correct?
A Yes.
Q And you say it was exclusively initiated by Mr. Kruger?
A The contact?
MS. O'NEIL: Objection.
Q Yes.
THE COURT: No, overruled.
A No, I mean, we were together for a year and a half. We had a dialogue.
Q So after the break-up, there was some back-and-forth; isn't that fair to say?
A Yes, and after I uncovered some facts, such as the Web Watcher and a few other facts, I didn't want any more contact with him. I realized, you know, I'm dealing with someone that is controlling and I'm in fear of him, so I asked him to stop contacting me.

Page 23

Q And there was contact after that, but you never reached out to him? You never initiated that contact?
A After the last text messages about a week ago, no.
Q Okay. Has he contacted you in the last week?
A He has not contacted me since he's received the letter to be in court today.
Q By the way, you mention a gym run-in on your affidavit?
A Um-hum.
Q And that's the gym where you both had memberships; correct?
A Correct.
Q And what did my client do? Did he walk up to you? Did he threaten you? Did he --
A No, I mean, he knows what class I go to in the morning and kind of roughly when I'm there, so it was, you know, --
Q What did he do?
A -- a little bit more than coincidental.
Q What did he do?
A Nothing.
Q Nothing. He was there when you were there.

Page 24

A Yes.
Q On one occasion.
A Um-hum.
Q Right?
A Um-hum.
Q Now, there was also an incident on the street when you ran into him on the street?
A Is that in the affidavit?
Q I'm not asking about your affidavit. I'm just asking you if there was an incident where you ran into him on the street.
A I've seen him on the street, yes.
Q And who contacted whom on the street when you ran into him?
A He was running out of his apartment, and I said -- and I was, like, "Glenn" -- like, this is right after we broke up.
Q Yeah. And you called out to him, didn't you?
A Right. Again, this is before I learned a lot of information, and it was right after we broke up.
Q So when did you initially find out that something had been done with your computer? It was about six weeks ago, was it not?
A I received confirmation I'd say about a month

ago, maybe less.
Q So it was several weeks after that that you went in and sought this order. Isn't that right?
A Yes.
Q And you also mentioned that he threw a drink on a friend of yours, right?
A Um-hum.
Q Who was that friend?
A Her name is Jessica Martin.
Q And did you witness this?
A I left the bar.
Q So you did not witness it.
A No.
Q Do you know what, if anything, she did prior to him throwing the drink on her?
A They had had a conversation. I think she had -- he had somehow initiated something, and I think she may have punched him --
Q Punched him in the groin?
A Yes.
THE COURT: You weren't involved in that incident?
MS. BELL: No; I left the bar.
Q I'm going to ask you to set aside for the moment,

if you can, the feelings that you had during this relationship and particularly the break-up. Even set aside how you felt a week ago when you initially sought this restraining order.
Are you telling this court that as you sit here now today, you are in fear of bodily injury by Mr. Kruger?
A Yes.
Q And the basis of that fear is that while you were dating, he pushed you a couple of times?
A I know that he's very aggressive, and with the information that he knows is out there right now, and also, there's some other facts that we have recently uncovered. I don't know if --
Q He is aggressive with information?
THE COURT: Yeah, what does that mean?
A There's --
MS. O'NEIL: I think -- what I hear my client saying is that she's learned some things recently, the recent information that she's learned.
THE COURT: From other people, from other women, is that what you're suggesting?
MS. BELL: Yes.

MS. O'NEIL: Your Honor, you know, part of this is, I've instructed her not to talk about what's going on with her. There are two other women that he was dating at the same time. There was software installed on all of their computers.
MR. MATHERS: I object to that.
THE COURT: All right.
MS. O'NEIL: Which is why I've asked her not --
THE COURT: If she doesn't know it firsthand, it's probably hearsay information.
MS. O'NEIL: But I think that's what the -- when she refers to other information --
THE COURT: Yeah, well, all right, I mean, if you're going to ask about it, you can ask about it.
MR. MATHERS: I'm satisfied, Judge. I'm going to withdraw that question.
Q So he never hit you, never punched you, right? Am I correct?
A Um-hum.
Q Never threatened to hit or punch you; correct?
A No.
Q And yet you are in fear of imminent physical harm

as you sit here today?
A Yes.
Q Thank you.
THE COURT: Anything else?
MS. O'NEIL: Just very briefly, Your Honor.

RE-DIRECT EXAMINATION

BY MS. O'NEIL:

Q It's recently that you've learned about how sophisticated this web tracker information is; is that right?
A Correct.
Q You knew about this key stroking program a couple of weeks ago?
A Right.
Q But this web tracking and the sophisticated nature and the fact that you can intercept e-mails and learn someone's entire history on their computer, that's something that you recently learned.
A Correct.

Q And you learned as well that it had been installed in other individuals' computers as well.
A Right.
MR. MATHERS: I object.
MS. O'NEIL: I have no further questions, Your Honor.
THE COURT: All right. Thank you. You may step down.
MS. BELL: Thank you.
THE COURT: Any other evidence on behalf of plaintiff?
MS. BELL: Not other than the police report that I believe is part of the court file. Thank you.
THE COURT: All right. Defendant?
MR. MATHERS: Mr. Kruger will testify, Your Honor.
THE COURT: All right.

DIRECT EXAMINATION

BY MR. MATHERS:
Q Mr. Kruger, would you state your full name for

the record, please?
A Glenn Stewart Kruger.
Q And where do you live?
A 15 Joy Street in Beacon Hill.
Q And what do you do for work?
A I'm an investment banker.
Q How long have you been doing that?
A Five years.
Q And you had a dating relationship with Ms. Bell?
A Yes, since --
Q And did that go on for about a year and a half?
A No, it was longer; in fact, our first date was January 16, 2009, and it ended October 8, 2010.
Q At some point, did you install some software on her computer?
A I did.
Q And at some point, did you admit to that?
A I did. It was in the course of a conversation. Audrey had heard -- sorry. The plaintiff had heard that -- she had asked me, "Did you install a key logger?" And I said yes.
The software, while sophisticated, really isn't that sophisticated; it does not enable you to -- allow you to take control of the

machine; it merely will log key strokes, it will take snapshots of specific websites that you indicate --
Q Is there a GPS involved so you --
A Absolutely not, no.
Q Okay. Well, at some point, did you admit to what you did?
A Yes.
Q And did you apologize for it?
A Profusely, repeatedly.
Q How many times do you think?
A A hundred, if not more.
Q Were you aware of any contact she was having with an old boyfriend on Facebook?
MS. O'NEIL: Objection.
A Yes.
THE COURT: No, he can answer it.
Q Was this a woman that you were, at one point, considering asking her to marry you?
A Yes.
Q Well, when the relationship -- give me the date that the relationship ended?
A October 8, 2010.
Q And was there contact after that date?

A Frequent.
Q Continuing on until when?
A I sent Audrey -- sorry, the plaintiff a text message on November 20th, my last. I'd recently learned some information about her after practically two months of constant barraging from her about the nature of my actions, perhaps rightfully so. But since November 20th, no more.
Q By the way, let me just clear up one thing. Have you ever done this software tracking with anybody else?
A No.
Q Any other girlfriends?
A No.
Q Any other girls that you've been with?
A Absolutely not.
Q After you broke up, did you run into Ms. Bell at the Liberty Hotel?
A Yes. On three occasions, the first of which I ignored her, walked by her. She chased after me.
The second instance, I saw her friends, realized she must be in the area, because her friends do not live locally, and proceeded to the escalator or the elevator. Her friends chased me

down, berated me for at least thirty minutes --
Q Is this the incident with the drink?
A No. That was the third instance. I saw her --
Q So the second instance, did you --
A I didn't see her, no, I didn't actually make eye contact or see her in any way.
Q Tell me about the third incident.
A The third incident, I saw her at the upper level of the Liberty Hotel. I proceeded to go downstairs. I did text her to tell her I was going downstairs.
Q Did you say, "Please come down" and --
A No, no, I sent one word -- well, I sent a text regarding the gentleman she was with. The second text was the word "downstairs." And preceding that -- well, following that, two of her friends followed me downstairs and proceeded to berate me at the bar downstairs.
Q And eventually, did something happen with one of her friends?
A Yes. I went back upstairs at some point. It was empty. Clearly the plaintiff wasn't there. I approached one of her friends to explain to her that she can -- I barely knew her, she can stop

chasing me down in bars. This was the second time she had done this.
The other friend, Jess Martin, who I knew by virtue of the fact that she had dated an ex-boyfriend -- sorry, she was the ex-girlfriend of a friend of mine, and while I hadn't engaged her, she reached over and tried to punch me in the groin. She actually did punch me in the groin.
Q And what did you do as a result?
A I may have poured my drink on her.
Q And running into her in the street, do you recall the circumstances surrounding that?
A Yes. I was going for a run. My street is -- my front door is directly opposite Pinckney Street, which runs perpendicular to my street. I left my front door, ran down Pinckney Street, heard my name called, doubled back and realized it was the plaintiff.
Q And did you have a conversation? I don't want to get into what it was, but did you talk with her?
A Yes. We actually walked back to her apartment together, and then I went for a run.
Q After you broke up and after she said, "I don't

want to have any more contact," did you contact her? Did you text her at any time?
A Well, yeah, we had agreed to stop talking to each other for emotional health reasons at least four or five times. So, yes, it was a repeated thing, and she would contact me or I would contact her.
Q So she would break the --
A Absolutely.
Q -- rule as well as you?
A Absolutely, yes.
Q Did you confront her in the gym at any point after you broke up?
A No, never. I was there to meet someone else, so it wasn't my gym schedule, didn't intend to see her, was actually talking to someone else, saw her walk by and walked by. I kept my eye focused on the person I was talking to.
She came back, stared at me briefly, walked off again to change and then left, staring at me the entire time while I kept my focus on this other individual.
Q And was the other individual a man or a woman?
A A woman.
Q By the way, did you obtain a new gym membership?

A I did.
Q And do you have the contract for that new membership in your breast pocket?
A I do.
Q Do you intend to go back to your old gym at all?
A If only to cancel the gym, unless I can do it over the phone.
Q So that your last contact with Ms. Bell was how long before the application of this restraining order? Do you know?
A I think it was three days before the application and five -- four days before I received it in the mail, so November 20th, I stopped to realize that there was no point in continuing to maintain contact. And then I received the order four days later in the mail.
Q Did you ever hit Ms. Bell?
A No, never.
Q Did you ever threaten to hit or hurt her?
A Never, ever.
Q Did you ever shove her?
A No, not forcefully.
Q Did you --
A The incident -- sorry. The incident referred to

was, the plaintiff was lying down in bed. She refused to engage. I merely --

Q When you say "refused to engage," do you mean, "refused to talk to me"?

A Yes, yes.

Q Okay. And what did you do?

A I, one-handedly, tried to roll her over, but that was about it. That's about as forceful as it was.

Q Okay. Anything standing up, any shoving --

A Never.

Q -- against the wall or anything?

A Never, never.

Q Are you concerned about the effect of an active restraining order on your professional prospects --

MS. O'NEIL: Objection.

Q -- as an investment banker?

THE COURT: No, he may answer it.

A Yes, definitely.

MR. MATHERS: That's all I have.

THE COURT: Thank you. Go ahead.

MS. O'NEIL: Thank you, Your Honor.

CROSS EXAMINATION

BY MS. O'NEIL:

Q Mr. Kruger, my name is Allison O'Neil. I have a few questions for you. Your relationship with Ms. Bell, was that an exclusive relationship?

A Not the entire time, no.

Q Okay. So what portion of the -- you describe it as a two-year relationship? Did I hear that correctly?

A Yes, it was a two-year relationship. I believe the first six months, we were both dating other people.

Q Okay, which would take us to an eighteen-month, then, period where it was an exclusive relationship?

A And eighteen-month exclusive -- well, if you do the math, about a year exclusive relationship.

Q Okay. And you didn't see anybody or date anybody else during that year period?

A I did.

Q You did.

A I did, one other person.

Q And who was that?

A Brianne Staples (phonetic).

Q Brianne Staples. Do you know the name Lindsey Webster?

A I do.

Q Were you dating her at any point from, say, January of 2008 to the present time?

A No.

Q Okay. This shove that you described while Ms. Bell was in bed, this was a one-handed shove?

A Um-hum.

Q Were you arguing with her at that time?

A We were having an argument, yes.

Q A moment ago, though, you indicated that she wouldn't engage with you. Was she speaking to you, arguing with you at the time that you shoved her?

A Yes.

Q She was talking to you?

A Well, prior to that. It was at the end of a wedding. We were back in our hotel room.

THE COURT: Excuse me one second, counsel.

(Brief pause.)

A I wouldn't characterize it as an aggressive shove.

Q Okay. But my question to you was, was she engaging in conversation with you when you placed your hand on her?

A Not at the time, no.

Q Are you right-handed or left-handed?

A Right-handed.

Q And did you use your right hand?

A I did.

Q Where did you place your right hand?

A On her shoulder.

Q And where was she?

A Lying face-down in bed.

Q And did she do anything in response?

A She yelled at me.

Q Did she strike you in any way?

A She may have. I don't recall.

Q Okay. Was this incident, the argument was around the fact that you were upset that she wouldn't dance with you; am I right?

A No.

Q What was the argument about?

A She left me at the wedding.

Q And you were upset about that?
A I was upset that somebody would have no consideration but to leave me at her friend's wedding.
Q The key logger, as you describe it, is it also known as a key stroker?
A I didn't describe it as a key logger; she did.
Q Okay. What would you call it?
A I would call it a -- the software entirely? Key logging is a component.
Q What did you put on her computer?
A It was spyware.
Q Spyware.
A Correct, not tracking software.
Q And what was the purpose of the spyware?
A To determine whether the extent to which she was having relationships with other men on Facebook.
Q And it controls -- the individual who uses that computer, it controls what websites they go to?
A No.
Q What does it do?
A It can take screenshots of websites that you designate.
Q Which websites did you designate?

A Facebook.
Q Anything else?
A I don't recall.
Q Do you know the term key logger or key stroker?
A I do.
Q And what's the purpose of those softwares?
A To record keystrokes.
Q Right. And in addition, it can also obtain passwords; am I right?
A It could be used for that.
Q Yeah. And it can obtain passwords for someone's Facebook account, for example?
A It could be done, used for that.
Q And when you have the password to someone's Facebook account, you can also delete e-mails from within that individual's Facebook?
A That is possible.
Q Okay. Have you ever deleted e-mails from Ms. Bell's e-mail accounts?
A Yes.
Q And how many of her devices, her electronic devices did you install the spyware?
A Three. Three, I believe, three or four.
Q And some of these were personal electronic

devices as well as her work electronic devices?
A Correct.
Q Did you install this in any other girlfriend's computers in the past, or electronic devices?
A No, no.
Q Not once?
A I installed many things on Audrey's computer. She allowed me administrative access to her computers.
Q My question is whether you've installed the spyware in any other ex-girlfriend --
A Absolutely not, no.
Q -- or current girlfriend's -- why not?
A I trusted them.
Q Okay. The Liberty Hotel, that's a place that Audrey would frequent?
A We would both frequent the Liberty Hotel.
Q Okay. And since you've broken up, you've described that you've gone there on three occasions?
A I have gone there with friends on three occasions, yes.
Q Okay. And you had an interaction, you started to describe the second --

A Actually, I take that back; I've gone there many more occasions. I've only run into the plaintiff on three occasions.
Q Okay. And you had an interaction the second time you were there; is that right?
A No. The first time, the plaintiff and I spoke after she came to speak to me. The second time, I did not even see her there.
Q Did you text her?
A I don't recall.
Q You didn't say anything about the fact that, "You could do better than the gentleman you're with"?
A You're referring to the third instance.
Q Okay. The third instance, you did that?
A Yes.
Q And you made some derogatory remarks about the gentleman she was speaking to?
A Not derogatory.
Q You didn't tell her she could do better than that?
A Is that derogatory?
Q Did you say that?
A I may have. I don't recall.
MS. O'NEIL: Okay. I have no further

questions.

THE COURT: All right. Thank you. Anything else?

MR. MATHERS: Nothing, Your Honor.

THE COURT: All right. Thank you. You may step down.

MR. KRUGER: Thank you.

THE COURT: Any other evidence on behalf of the defendant?

MR. MATHERS: No other evidence, Your Honor.

THE COURT: Do you wish to be heard?

MS. O'NEIL: Just very briefly, Your Honor. The defendant, in his own words, has described or admitted to both shoving the plaintiff on a prior occasion as well as installing this software; spyware is the term of it.

I think this is evidence of an individual who engages in controlling behavior. There has been allusion to the fact in this hearing today that there are other individuals. My client has testified on the stand that she is in fear and that she remains in fear, and I'd ask

that this order be issued.

MR. MATHERS: Your Honor, the plaintiff in this case went to the Boston Police and she made a report. I hope you have a look at that. And in that report, she details her contentions, and they primarily revolve around the computer.

And then she goes on to complain about his proximity to her during activities, including the gym. And that's it. She fills out an affidavit and says that he's aggressive in arguments and details many of the same incidents in her affidavit: appearing at the hotel, texts after saying no contact, the drink on the friend, and the run-in at the gym.

All the lawyers in this room know that's not enough, Your Honor. Thereafter, she apparently obtains counsel, comes in here and, for the first time, after discussing these matters with the police, after filling out an affidavit that asks for as much detail as possible, for the first time she tells us that she was pushed, she was the victim of abuse, she was pushed.

It strains credulity that after two

opportunities to give that detail, she comes in here in open court and, you know, for the first time, either remembers it or puts it in terms that are permissible under the statute for the issuance of an order.

I'd ask you to consider that. I'd ask you to consider that the push that has been admitted to is a push that people -- the nature of which people engage in all the time during rocky relationships and relationships that come to an end. You know, a certain amount of human contact is justified and permissible, particularly in the context of romantic relationships.

It does not -- if it gives rise to a subjective fear, it does not give rise to an objective fear of imminent physical harm from Mr. Kruger; even if The Court finds that she's got a legitimate subjective fear, The Court's got to find that it's a reasonable fear. This fear, to the extent that you find it exists, simply would not -- there's no basis in the record to find that it's a reasonable fear.

There's every reason in the world for

Ms. Bell to be angry at my client, and I think even he concedes that, with the tracking software, you know, but that's not the proper basis of a restraining order.

The relationship is over. He's got a new gym. There's no need for this order to be issued.

THE COURT: Anything else?

MS. O'NEIL: Nothing further, Your Honor.

THE COURT: Let me just ask plaintiff's attorney, the statute requires imminent fear of serious physical harm. What, in your view, supports that prong of the statute, based on the evidence?

MS. O'NEIL: Your Honor, I think the evidence that was presented here today is that there has been a history of aggressive behavior, including a shove. What has been alluded to in the record is that there's three women this individual was dating. They're all now speaking.

What Ms. Bell has learned prior, just prior to coming in and seeking the restraining order is that this individual was tracking her

every move on the computer, her every move, had her passwords through this key logger system and had installed something called spyware. It's because he wanted to control her.

And when she first came in here, it was close to the event. She wasn't thinking and may not have filled out some paperwork without the assistance of a victim witness advocate or without the assistance of counsel and said things perfectly, but she sat before you today and I think she testified quite clearly about the fear that she's in. I heard her voice get shaky when she spoke about it.

And based on the totality of the evidence, the controlling nature that you heard about, as well as some of the past aggressive behavior, as well as my client's own statements that as she sits here today, that she is in fear, I believe that fear is imminent and it is real, and she's asking for the restraining order.

THE COURT: Any further response?

MR. MATHERS: I'd ask Your Honor to focus on the reasonableness prong there that Your Honor has got to find. It was obviously a

relationship with some passion on both sides. These issues are difficult to discuss.

If Your Honor did notice -- I didn't notice it, but if Your Honor did notice a shaking of the voice, I don't think that's dispositive of anything more than the fact that, you know, these matters are difficult to discuss in any context.

THE COURT: Yes. These kinds of cases are difficult, but I am aware of the standards and the requirements under the statute. And in and of itself, certain incidents isolated may not support issuance of the order.

However, when The Court looks at all of these circumstances cumulatively, there are certain facts that come out here that could support an inference of her being currently fearful. She described some aggressive behavior toward her, an unwanted physical shoving. She described instituting some kind of tracking software system on her computer which would give the defendant access to her whereabouts and her e-mails. And she described other encounters with him, unwanted encounters, although I don't disagree with the defendant that, in fact, those

may have been chance meetings in some regards.

But looking at the aggression that was described in the various arguments and looking at the fear that might be engendered, and, in fact, I credit that it is engendered as a result of someone tracking one's every move and interfering with their work and personal life in that regard is sufficient for The Court to draw an inference that she felt threatened and harmed by those actions. The defendant himself admitted to that conduct. He admitted to pushing, although he states not forcefully.

However, all of those circumstances not isolated and taken together I think support an objective reasonable fear of any future harm, or harm.

Now, I understand, when an order may issue, it obviously affects someone's situation. I would consider issuing an order for a short period of time to see if that would resolve the issues between the parties and that there be no further contact. And I'm open to a suggestion. I'm considering a three-month order at this time.

MS. O'NEIL: I would ask for a six-

month, just for a longer period of time.

MR. MATHERS: First thought that came to my mind, Judge, was one month. I suggest you stay where you started out, at three months. I don't think there'll be any more contact.

THE COURT: Well, it would give, at least -- three or six months would give the parties an opportunity to have no further contact. And that means no contact whatsoever; that means electronically; if you walk into an institution, whether it's the Liberty Hotel or it's the gym, a gym, any gym, or a party or a wedding, the defendant needs to go the other way.

And that's the bottom line here. No texting, no phone calls. No communications through friends and associates; direct or indirect communication is precluded under an order. All right. I will continue it until April 1, 2011.

THE CLERK: Court order is entered ordering the defendant not to abuse the plaintiff, not to contact the plaintiff in any way, and to remain at least one hundred yards away from the plaintiff, to stay away from the

plaintiff's residence, to stay away from the plaintiff's workplace, to surrender any firearms, ammunition, or firearms FID card to the Boston Police, if any.

This order will remain in effect until April 1, 2011. That will also be the next hearing date if further extension is requested. April 1, 2011, this courtroom, Courtroom C, at 9:00 a.m. Please remain in the courtroom while I make copies of this order for each of you.

MS. O'NEIL: Thank you, Your Honor.

MR. MATHERS: Thank you, Your Honor.

THE COURT: All right.

(Whereupon the proceedings were concluded.)

C E R T I F I C A T E

This is to certify the foregoing is a true and accurate transcript, to the best of my skill and ability, of the proceedings in the matter of Audrey Bell, Plaintiff, vs. Glenn Kruger, Defendant, Docket No. 2010-01-AC-0207, heard on December 3, 2010.

Lisa M. Cimmino ____________ Date ____________

*Notary Public*